The CHIEF JUSTICE
delivered the opinion of the court.
The question which we have to consider is this:
Was Bronson bound by law to accept from Rodes United States notes equal in nominal amount to the sum due him' as full performance aud satisfaction of a contract which stipulated for the payment' of that sum in gold and silver coin, lawful money of the United States ?
It is not pretended that any real payment and satisfaction of an obligation to pay fifteen hundred and seven coined dollars can be made by the tender of paper money worth in' the market only six hundred and seventy coined dollars. The question is, Does the law compel the acceptance of such a tender for such a debt ?
It is the appropriate function of courts of justice to enforce contracts according to the lawful intent and understanding of the parties.
We must, therefore, inquire what was the intent and understanding of Frederick Bronson and Christian Metz when they entered into the contract under consideration in December, 1851.
*246 And this inquiry will be assisted by reference to the circumstances under which the contract was made.
Bronson was an executor, charged as a trustee with the administration of an estate.' Metz was a borrower from the estate. It was the clear duty of the former to take security for the full repayment of the money loaned to the latter.
The currency of the country, at that time, consisted mainly of the circulating notes of State banks, convertible, under the laws of the States, into coin on demand. This convertibility, though far from perfect, together with the acts of Congress which required the use of coin for all receipts and disbursements of the National government, insured the presence of some coin in the general circulation; but the business of the people was transacted almost entirely through the medium of bank notes. The State banks had recently emerged from a condition of great depreciation and discredit, the effects of which -were still widely felt, and the recurrence of a like condition was not unreasonably apprehended by many. This apprehension was, in fact, realized by the general suspension of coin payments, which took place in 1857, shortly after the bond of Metz became due.
It is not to be doubted, then, that it was to guard against the possibility of loss to the estate, through an attempt to force the acceptance of a fluctuating and perhaps irredeemable currency in payment', that the express stipulation for payment in gold and silver coin was put into the bond.. There was no necessity in law for such a stipulation, for at that time no money, except of gold or silver, had been made a legal tender. The bond without any stipulation to that effect would have been legally payable only in coin. The terms of the contract must have been selected, therefore, to fix definitely the contract between the parties, and to guard against any possible claim that payment, in the ordinary currency, ought to be accepted.
/The intent of the parties is, therefore, clear. "Whatever might be the fornis or the fluctuations of the note currency, this contract was not to be affected by them. It was to be paid, at all events, in coined lawful money.
*247 We have just adverted to the fact that the legal obligation of payment in coin was perfect without express stipulation It will be useful'to consider somewhat further the precise import in law of the phrase “dollars payable in gold and silver coin, lawful money of the United States.”
To form a correct judgment on this point, it will be necessary to look into the statutes regulating coinage. It would be instructive, doubtless, to review the history of. coinage in the United States, and the succession of statutes by which the weight, purity, forms, and impressions of the gold and silver coins have been regulated; but it will be sufficient for our purpose if we examine three only, the acts of April 2, 1792,* of January 18, 1837,† and March 8, 1849.‡
The act of 1792 established a mint for the purpose of a national coinage. It was the result of very careful and thorough investigations of-the whole subject, in which Jefferson and Hamilton took the greatest parts; and its general principles have controlled all subsequent legislation. It provided that the gold of coinage, or standard gold, should consist of eleven parts fine and one part alloy, which alloy was to be of silver, and copper in convenient proportions, not exceeding one-half silver; and that the silver of coinage should consist of fourteen hundred and eighty-five parts fine, and one hundred and.seventy-nine parts of an alloy wholly of copper.
The same act established the dollar as the money unit, and required, that it should contain four hundred and sixteen grains of standard silver. It provided further for the coinage of half-dollars, quarter-dollars, dimes, and half-dimes, also of standard silver, and weighing respectively a half, a quarter, a tenth, and a twentieth of the weight of the dollar. Provision was also made for a gold coinage, consisting of eagles, half-eagles, and quarter-eagles, containing, respectively, two hundred and ninety, one hundred and thirty-five, and sixty-seven and a half grains of standard gold, and be* *248 ing of the value, respectively, of ten dollars, five dollars, and two-and-a-half dollars.
These coins were made a lawful tender in all payments according to their respective weights of silver or gold; if of full weight, at their declared values, and if of less, at proportional values. And this regulation as to tender remained in full force until 1837.
The rule prescribing the composition of alloy has never been changed; but the proportion of alloy to fine gold and silver, and the absolute weight of coins, have undergone some alteration, partly with a view to the better adjustment of the gold and silver circulations to each other, and partly for the convenience of commerce.
The only change of sufficient importance to require notice, was that made by the act of 1837.* That act directed that standard gold, and standard silver also, should thenceforth consist of nine parts pure and one part alloy; that the weight of standard gold in the eagle should be two hundred and fifty-eight grains, and in the half-eagle and quarter-eagle, respectively, one-half and one-quarter of that weight precisely; and that the weight of standard silver should be in the dollar four hundred twelve and a half grains, and in the half-dollar, quarter-dollar, dimes, and half-dimes, exactly one-half, one-quarter, one-tenth, and one-twentieth of that weight.
The act of 1849† authorized the coinage of gold double-eagles and gold dollars conformably in all r.espeets to the established standards, and, therefore, of the weights respectively of five hundred and sixteen grains and twenty-five and eight-tenths of a grain.
The methods and machinery of coinage had been so improved before the act of 1837 was passed, that unavoidable deviations from the prescribed weight became almost inappreciable; and the most stringent regulations were enforced to secure the utmost attainable exactness, both in weight and purity of metal.
*249 In single coins the greatest deviation tolerated in thé gold coins was half a grain in the double-eagle, eagle, or half-eagle, and a quarter of a grain in the quarter eagle or gold dollar;* and in the silver coins, a grain and a half in the dollar and half-dollar, and a grain in the quarter-dollar, and half a grain in the dime and half-dime.†
In 1849 the limit of deviation in weighing large numbers of coins on delivery by the chief coiner to the treasurer, and by the treasurer to depositors, was still further narrowed.
"With these and other precautions against the emission of any piece inferior in weight or purity to the prescribed standard, it was thought safe to make the gold and silver coins of the United States legal tender in all payments according to their nominal or declared values. This was done by the act of 1837. Some regulations as to the tender, for small loans, of coins of less weight and purity, have been made; but no other provision than that made in 1837, making coined money a legal tender in all payments, now exists upon the statute-books.
The design of all this minuteness and strictness in the regulation of coinage is easily seen. It indicates the intention of the legislature to give a sure guaranty'to the people that the coins made current in payments contain the precise weight of gold or silver of the precise degree of purity declared by the statute. It recognizes the fact, accepted by all men throughout the world, that value is inherent in the precious metals; that gold and silver are in themselves values, and being such, and being in other respects best adapted to the purpose, are the only proper measures of value; that these values are determined by'weight and purity; and that form and impress are simply certificates of value, worthy of absolute reliance only because of the known integrity and good faith of the government which gives them.
The propositions just stated are believed to be incontestable. If they are so in fact, the inquiry concerning the legal import of the phrase “ dollars payable in gold and silver *250 coin, lawful money of the United States,” may be answered without much difficulty. Every such dollar is a piece of gold or silver, certified to be of a certain weight and purity, by the form and impress given to it at the mint of the United States, and therefore declared to be legal tender in payments. Any number of such dollars is the number of grains of standard gold or silver in one dollar multiplied by the given number.
. Payment of money is deliveryby the debtor to the creditor of the amount due. A contract to pay a certain number of dollars in gold or silver coins is, therefore, in legal import, nothing else than an agreement to deliver a certain weight of standard gold, to be ascertained by a count of coins, each of which is certified to contain a definite proportion of that weight. It'is not distinguishable, as we think, in principle, from a contract to deliver an equal weight of bullion of equal fineness. It is distinguishable, in circumstance, only, by the fact that the sufficiency of the amount' to be tendered in payment must be ascertained, in the case of bullion, by assay and the scales, while in the case of coin it may be ascertained by count.
We -cannot suppose that it was intended by the provisions, of the currency acts to enforce satisfaction of either .contract by the tender of depreciated currency of any description equivalent only in nominal amount to the teal value of the' bullion or of the coined dollars. Our conclusion, therefore, upon this part of the case is, that the bond under consideration was in legal import precisely what it was in the understanding of the.parties, a valid obligation to be satisfied by a tender of actual payment according to its terms, and not by an offer of mere nominal payment. Its intent was that the debtor should deliver to the creditor a c'ertain weight of gold and silver of a certain fineness, ascertainable by count of coins made legal tender by statute; and this intent was lawful.
- Arguments and illustrations of much .force and value in support of this conclusion might be drawn from the possible case of the repeal of the legal tender laws relating to coin, *251 and the consequent reduction of coined money to the legal condition of bullion, and also from the actual condition of partial demonetization to which gold and silver money was reduced by the introduction into circulation of the United States notes and National bank currency; but we think it unnecessary to pursue this branch of the discussion further.
Nor do we think it necessary now to examine the question whether the clauses of. the currency acts, making the United States notes a legal tender, are warranted by the Constitution.
But we will proceed to inquire whether, upon the assumption that those clauses are so warranted, and upon the further assumption that engagements to pay' coined dollars may be regarded as ordinary contracts to pay money rather than as contracts to deliver certain weights of standard gold, it can be maintained that a contract to pay coined money may be satisfied by a tender of United States notes.
Is this a performance of the contract within the true intent of the acts ?
It must be observed that the laws for the coinage of gold and silver have never been repealed or modified. They remain on the statute-book in full force. And the emission of gold and silver coins from the mint continues; the actual coinage during the last fiscal year having exceeded, according to the report of the director of the mint, nineteen millions of dollars.
Nor have those provisions of law which make these coins a legal tender in all payments been repealed or modified.
It follows that there were two descriptions of money in • use at the time the tender under consideration was made, both authorized by law, and both made legal tender in payments. The statute denomination of.both descriptions was dollars; but they were essentially unlike in nature. The coined dollar was, as we have said, a piece of. gold or silver of a prescribed degree of purity, weighing a prescribed number of grains. The note dollar was a promise to pay a coined dollar; but it was not a promise to pay on demand nor at any fixed time, nor was it, in fact, convertible into a coined dollar. It was impossible, in the nature of things, *252 that these two dollars should he the actual equivalents of each other, nor was there anything in the currency acts purporting to make them such. How far they were, at that time, from being actual equivalents has been already stated.
If, then, no express provision to the contrary be found in the acts of Congress, it is a just if not a necessary inference, from the fact that both descriptions of money were issued by the same government, that contracts to pay in either were equally sanctioned by law. It is, indeed, difficult to see how auy question can be made on this point. Doubt concerning it can only spring from that confusion of ideas which always attends the introduction of varying and uncertain measures of value into circulation as money. .
The several statutes relating: to money and legal tender must be construed together. Let it be supposed then that the statutes providing for the coinage of gold and silver dollars are found among the statutes of the same Congress which enacted the laws for the fabrication and issue of note' dollars, and that the coinage and note acts, respectively, make coined dollars and note dollars legal tender in all pay- ■ ments, as they actually do. -Coined dollars are now worth more than note dollars; but it is not impossible that note dollars, actually .convertible into coin at the chief .commercial centres,'receivable everywhere, for all public dues, and made, moreover, a legal tender, everywhere, for all debts, may become, at some points, worth more than coined dollars. What reason can be assigned now for saying that 9, contract to pay coined dollars must be satisfied by the tender of an equal number of note dollars, which will not be equally valid then, for saying that a contract to pay note dollars must be satisfied by the tender of an equal number of coined dollars?
It is not easy to see how difficulties of this sort can be avoided, except by the admission that the tender must be according to the terms of the contract.
But we are not left to gather the intent of these currency acts from mere comparison with the coinage acts. The currency acts themselves.provide for payments in coin. Duties on imports must be paid in coin; and interest on the public *253 debt, in the absence of other express provisions, must also be paid in coin. And it hardly requires argument to prove that these positive requirements cannot be fulfilled if contracts between individuals to pay coin dollars can be satisfied by offers to pay their nominal equivalent in note dollars. The merchant who is to pay duties in coin must contract for the coin which he requires; the bank which receives the coin on deposit contracts to repay coin on demand; the messenger who is sent to the bank or the custom-house contracts to pay or deliver the coin according to his instructions. .These are all contracts, either express or implied, to pay coin. Is it not plain that duties cannot be paid in coin if these contracts cannot be enforced ?
An instructive illustration may be derived from another provision of the same acts. It is expressly provided that all dues to the government, except for duties o.n imports, may be paid in United States notes. If, then, the government, needing more coin than can be collected from duties, contracts with some bank or individual for the needed amount, to be paid at a certain day, can this contract for coin be performed by the tender of an equal amount in note dollars? Assuredly it may if the note dollars are a legal tender to the government for all dues except duties on imports. And yet a construction which will support such a tender will defeat a very important intent of the act.
‘Another illustration, not less instructive, may be found in the contracts of the government with depositors of bullion at the mint to pay them the ascertained value of their deposits in coin. These are demands-against the government other than for interest on the public debt; and the letter of the acts certainly makes United States notes payable for all demands against the government except such interest. But can any such construction of the act be maintained ? Can judicial sanction be given to the proposition that the government may discharge its obligation to the depositors of bullion by tendering them a number of note dollars equal to the number of gold or silver dollars which it has contracted by law to pay ?
*254 But we need not pursue the subject further. It seems to us clear beyond controversy that the act must receive the reasonable construction,'not only warranted, but required by the comparison of its provisions with the provisions of other acts, and with each other; and that upon such reasonable construction it must be held to sustain the proposition that express contracts to pay coined dollars can only be satisfied by the payment of coined dollars. They are not “ debts ” which may be satisfied by the tender of United States notes.
It follows that the tender under consideration was not sufficient in law, and that the decree directing satisfaction of the mortgage was erroneous.
Some difficulty has been felt in regard to the judgments proper to be entered upon contracts for the payment of coin. The difficulty arises from the supposition that damages can be assessed only in one description of money. But the act of 1792 provides that “the money of account of the United States shall be expressed' in dollars, dimes, cents, and mills, and that all accounts in the public offices, and all proceedings in the courts of the United States, shall be kept and had in conformity to these regulations.”
This regulation-is part of the first coinage act, and doubtless has reference to the coins provided for by it. But it js a.general regulation, and relates to all accounts and all judicial proceedings. When, therefore, two descriptions of money are sanctioned by law, both expressed in dollars and both made current in payments, it is necessary, in order to avoid ambiguity and prevent a failure of justice, to regard this regulation as applicable alike to both. When, therefore, contracts made payable in coin are sued upon, judgments may be entered for coined dollars and parts of dollars; and when contracts have been made payable in dollars generally, without specifying in what description of currency payment ■is to be made, judgments may be entered generally, without such specification.
We have already adopted this rule as to judgments for *255 duties by affirming a judgment of the Circuit Court for the District of California,* in favor of the United States, for thirteen hundred and eighty-eight dollars and ten cents, payable in gold and silver coin, and judgments for express contracts between individuals for the payment of coin may be entered in like manner.
It results that the decree of the Court of Appeals of New' York must be reversed, and the cause remanded to that court for further proceedings.
Mr. Justice DAVIS.
I assent to the result which a majority of the court have arrived at, that an express contract to pay coin of the United States, made before the act of February 25th, 1862, com- ■ monly called the legal tender act, is not within the clause of that act which makes treasury, notes a legal tender in payment of debts; but I think it proper to guard against all possibility of misapprehension by stating that if there be any reasoning in the opinion of the majority which can be applicable to any other class of contracts, it does not receive my assent. .

 1 Stat. at Large, 246.

 5 Id. 136.

 9 Id. 397

 5 Stat. at Large, 137.

 9 Id. 397.

 9 Stat. at Large, 398.

 5 Id. 140.

 Cheang-Kee v. United States, 3 Wallace, 320.